Matter of Bentkowski v City of New York (2025 NY Slip Op 03690)

Matter of Bentkowski v City of New York

2025 NY Slip Op 03690

Decided on June 18, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on June 18, 2025

No. 57 

[*1]In the Matter of Robert Bentkowski, et al., Respondents,
v
City of New York, et al., Appellants.

Richard Dearing, for appellants. 
Jacob S. Gardener, for respondents. 
Aetna Life Insurance Company, American Medical Rehabilitation Providers Association et al., Common-Sense Caucus of the Council of the City of New York, Michael Wasserman et al., Physicians for a National Health Program-New York Metro, amici curiae.

TROUTMAN, J.:
New York City is required by law to provide health insurance coverage for persons retired from City employment. For more than 50 years, the City fulfilled its responsibility by offering a choice of health insurance plans. Options for Medicare-eligible retirees included Medicare supplemental plans—also known as Medigap plans—and Medicare Advantage plans (MAPs). Whereas a Medigap plan supplements traditional Medicare by covering additional out-of-pocket costs, a MAP is an all-in-one alternative to traditional Medicare that is funded primarily through Medicare subsidies. The most popular plan the City offered was Senior Care, a Medicare supplemental plan.
In 2021, to cut costs, the City made significant changes to its health benefits program. After related litigation halted the City's original plan (Matter of NYC Org. of Pub. Serv. Retirees, Inc. v Campion, 210 AD3d 559 [1st Dept 2022], affd 43 NY3d 228 [2024]), the City decided to discontinue Senior Care and most other options and enroll all retirees in a custom-designed MAP negotiated with and to be managed by insurer Aetna Life Insurance Company. Petitioners, nine retirees and one organization, commenced this proceeding asserting 12 causes of action seeking, among other things, to enjoin the City from eliminating their existing health insurance plans. Supreme Court ruled in favor of petitioners on their promissory estoppel cause of action and their cause of action under Administrative Code of the City of New York § 12-126 (b) (1), and the Appellate Division affirmed.
The primary issue before us is whether petitioners are entitled to judgment on their promissory estoppel cause of action. Because we conclude that petitioners are not so entitled, and that their alternative grounds for relief raised before us lack merit, we reverse the order of the Appellate Division and remit the matter to Supreme Court for a determination on petitioners' remaining causes of action.
I.

Petitioners commenced this proceeding and requested a preliminary injunction.[FN1] In their petition, they alleged that throughout their employment the City repeatedly promised them that upon retirement it would provide and pay for a Medicare supplemental plan, that they reasonably relied on those promises by making financial, employment, and retirement decisions based on the guarantee of Medicare supplemental coverage for life, and that they will suffer injury if removed from their existing health insurance plans due to higher copays, prior authorization requirements, and their preferred providers' refusal to accept the Aetna MAP. Some alleged that they did not budget for health insurance coverage in their retirement and now cannot afford to opt out of the Aetna MAP and obtain Medicare supplemental coverage elsewhere. Others alleged that they had relocated to states where insurers can legally deny Medicare supplemental insurance coverage based on preexisting health conditions, meaning that those retirees in the direst circumstances would not be able to obtain such coverage elsewhere, even if they could afford to do so.
To support the allegation of a clear and unambiguous promise of Medicare supplemental insurance coverage for life, petitioners submitted copies of Summary Program Descriptions (SPDs) that the City provides its employees and retirees on an annual basis to inform them of their health insurance options. The SPDs generally contain the following language:
"Through collective bargaining agreements, the City of New York and the Municipal Unions have cooperated in designing the benefits for the City's Health Benefits Program. These benefits are intended to provide you with the fullest possible protection that can be purchased with the available funding . . .
"This [SPD] booklet gives brief plan descriptions and a comparison of benefits of all available plans . . .
"When you or one of your dependents becomes eligible for Medicare at age 65 (and thereafter) or through special provisions of the Social Security Act for the Disabled, your first level of health benefits is provided by Medicare. The Health Benefits Program provides a second level of benefits intended to fill certain gaps in Medicare coverage . . . [T]he City's Health Benefits Program supplements Medicare but does not duplicate benefits available under Medicare."
Cover letters from the Mayor of the City of New York often accompanied the SPDs. While those letters routinely referred to the City's commitment to providing high-quality health coverage, they also often referred to ever-increasing medical costs and the fact that collective bargaining determined the amount of funds available to provide for health insurance costs.
Petitioners also submitted the affidavit of Lilliam Barrios-Paoli, who served the City for decades in various capacities under several mayoral administrations, including as Deputy Mayor for Health and Human Services. Barrios-Paoli stated that the SPD is "the most comprehensive guide to employees' and retirees' benefits," so much so that the City agencies' human resources (HR) staff and the employees' union representatives "relied on the SPD to explain benefits to workers and future retirees." Although the SPDs changed from year to year, she conceded, for decades the SPDs set forth a choice of benefits that always included access to traditional Medicare and a supplemental plan. "Importantly," Barrios-Paoli continued, "City Agency HR people reiterated this promise of choice to generations of prospective City employees. The guarantee of good healthcare in retirement—including the choice to participate in traditional Medicare with a City-paid supplemental plan—was an essential recruiting and retention tool." Barrios-Paoli further stated that she had "hundreds of conversations" over approximately 25 years where she explained the choice of health insurance to employees, and that many of those about to retire told her that they had decided where they would live in retirement based on their understanding that a Medicare supplemental plan would give them access to the doctors and hospitals they needed.
Petitioners also submitted hundreds of affidavits provided by Medicare-eligible retirees. Those who alleged that a promise had been made to them did so in a paragraph that is virtually identical across all the affidavits. One representative example stated as follows:
"During my employment with the City and during my retirement, the City repeatedly promised that when I retired and became eligible for Medicare, the City would pay for my Medicare Part B premium plus my choice of a Medicare Supplemental plan. This promise was made to me in writing in [SPDs] and various other brochures."
Only a few of the affiants named a specific HR staff member who allegedly made an oral promise. One such affiant, for example, named an HR staff member who made the "same promise" as in the SPDs.
Respondents answered, arguing, among other things, that the City's statements in the SPDs did not constitute "a clear and unambiguous forward-looking promise sufficient to support a promissory estoppel claim." Furthermore, respondents stated that the Aetna MAP was the product of negotiation between the City, Aetna, and the Municipal Labor Committee (MLC), which represents over 100 municipal unions in the collective bargaining process. According to respondents, the Aetna MAP would allow the City to access federal subsidies, creating $500 million in savings to be allocated to a Health Benefits Stabilization Fund to provide sufficient reserves for future health benefits.
In addition, MLC and Aetna sought to intervene as respondents. Aetna submitted the affidavit of one of its vice presidents, who stated that Aetna obtained the list of providers who billed Senior Care and confirmed that 97% of those providers are either in Aetna's network or had billed Aetna within the prior two years. Aetna's vice president also stated that Aetna had agreed to waive 85% of its typical prior authorization requirements and that the Aetna MAP has a lower deductible than Senior Care, as well as an out-of-pocket maximum.
Supreme Court granted petitioners' request for a preliminary injunction, and thereafter the parties stipulated to the completeness of the record and jointly requested a final judgment. The court granted the petition on the grounds that the City's actions were barred by the doctrine of promissory estoppel and violated Administrative Code § 12-126 (b) (1).
The Appellate Division affirmed, concluding that, "for more than 50 years," the City made "a clear and unambiguous promise . . . that upon an employee's retirement, Medicare would provide the first level of hospital and medical insurance benefits and the City's benefits program would provide the second level to fill in the gaps" (229 AD3d 95, 100 [1st Dept 2024]). The Court relied primarily on the Barrios-Paoli affidavit and the fact that the City [*2]submitted no evidence to contradict the statements in that affidavit (see id. at 97-98, 100). The Court further concluded that petitioners reasonably and foreseeably relied on the promises because they chose public employment over often higher-paying private-sector employment and chose their residences and healthcare providers based on the availability of traditional Medicare, and that petitioners demonstrated injury to those whose providers would not accept the Aetna MAP (see id. at 101). The Court concluded, however, that the City's actions did not violate Administrative Code § 12-126 (see id. at 102-103).
We granted respondents leave to appeal (42 NY3d 909 [2024]), and we now reverse the Appellate Division order.
II.
The doctrine of promissory estoppel, which was conceived in 1920 and has developed over the past century, "provides a remedy for many promises or agreements that fail the test of enforceability under many traditional contract doctrines" (Calamari & Perillo, Contracts § 6.1, at 218 [6th ed]; see Restatement [Second] of Contracts § 90). While we have never recognized promissory estoppel as a standalone cause of action (see Matter of Hennel, 29 NY3d 487, 494 n 3 [2017]; Allegheny Coll. v National Chautauqua County Bank of Jamestown, 246 NY 369, 373-374 [1927]), the Appellate Division has done so in at least some circumstances, and its departments are unanimous that an essential element of a promissory estoppel claim is a " 'clear and unambiguous promise' " (Villnave Constr. Servs., Inc. v Crossgates Mall Gen. Co. Newco, LLC, 201 AD3d 1183, 1186 [3d Dept 2022]; see Vassenelli v City of Syracuse, 138 AD3d 1471, 1475 [4th Dept 2016]; Sabre Intl. Sec., Ltd. v Vulcan Capital Mgt., Inc., 95 AD3d 434, 439 [1st Dept 2012]; Agress v Clarkstown Cent. School Dist., 69 AD3d 769, 771 [2d Dept 2010]; see also 57 NY Jur 2d, Estoppel, Ratification, and Waiver §§ 51-54; Restatement [Second] of Contracts § 90). The Appellate Division has not, however, expressly decided whether a promissory estoppel cause of action can be based on promises made while the relevant question was a mandatory subject of collective bargaining. Here, we need not decide whether to recognize a promissory estoppel cause of action, either generally or in this particular context, because petitioners have failed to establish the existence of a clear and unambiguous promise.
The SPDs themselves contain nothing that could be construed as a clear and unambiguous promise of Medicare supplemental insurance coverage for life. To the contrary, we agree with the City that the language in the SPDs is descriptive and for informational purposes only. The language on which petitioners rely—"becomes eligible," "is provided," "provides," and "supplements"—is in the present tense. The descriptive nature of the SPD is reflected in the title of the document—Summary Program Description—and its informational nature is also clear from the context of the SPD, the purpose of which is to explain benefits for the upcoming year. Indeed, annual SPDs are necessary only because benefits change from year to year, a fact petitioners do not contest. Petitioners rely heavily on the phrase "and thereafter" in the SPDs as conclusive evidence of a continuing promise, but read in context this language is used only to explain when someone is eligible for Medicare and not in reference to any promise of future benefits. To the extent that one might infer a commitment of sorts from the SPDs' language, it does not rise to the level of a clear and unambiguous promise that the City would pay for Medigap coverage, as opposed to some other form of health insurance coverage, for the rest of every retiree's life.
Any inference of a lifetime promise derived from the SPDs is even less plausible in light of the prefatory language employed therein and the mayoral cover letters. The prefatory language explicitly states that health benefits are negotiated through collective bargaining, implying that those benefits could be changed through that same process, and that benefits are designed to provide "the fullest possible protection that can be purchased with the available funding," implying that the provision of benefits depends on the availability of funding. Furthermore, the cover letters often explicitly state that rising costs and funding limitations may affect benefits.[FN2] In 1992, Mayor Dinkins wrote of "dramatically increasing medical costs" and stated that the success of the program "depends" on "the mutual cooperation and combined effort of all concerned," including the City, the unions, and the retirees. He added that collective bargaining "determines the amount of funds available" and "which plans will be offered." In 1994 and 1996, Mayor Giuliani repeated statements of his predecessor, and in 1996 he added that the City was "continually seeking new and creative responses" to financial challenges. In 2004, Mayor Bloomberg offered similar [*3]statements and added that offering "comprehensive" and "affordable" coverage "is by no means an easy task." Those statements further underline that the SPDs were an explanation of the health insurance benefits that were available at the time—not a promise of the continuation of those benefits.
Because there is no clear and unambiguous promise in the SPDs, the affidavits of Barrios-Paoli and the hundreds of retirees likewise fail to establish the existence of such a promise. The "promise" to which Barrios-Paoli referred to in her affidavit was founded in the SPDs, which she described as "comprehensive." She stated that HR staff relied on the SPDs to explain health insurance benefits to employees as the benefits changed over the years. Barrios-Paoli's assertions are confirmed in the affidavits of hundreds of retirees, who also stated the City made its alleged promise of Medicare supplemental coverage for life in the SPDs and other brochures. The SPDs, however, undermine the assertion of a clear and unambiguous promise, and the other brochures are no more favorable to petitioners. Although a few of the nonparty retirees who submitted affidavits named an HR staff member who allegedly made an oral promise, no petitioner did so. And even those alleged oral promises often cite back to the SPDs. To the extent any City official made oral statements about the City's health insurance obligations that went beyond the SPDs—and to the extent the City could be bound by a statement made by a City official—those statements are not clearly and specifically described in the affidavits. Thus, the affidavits of the retirees no more establish a clear and unambiguous promise than do the SPDs. Absent a clear and unambiguous promise, any possible promissory estoppel claim must fail (cf. Sabre Intern. Sec., 95 AD3d at 439).
III.
As an alternative ground for affirmance, petitioners contend that Administrative Code § 12-126 (b) (1) requires the City to provide and pay for a Medicare supplemental plan, and that a MAP does not suffice. We reject petitioners' contention for the reasons stated at the Appellate Division (see 229 AD3d at 102-103). The requirement that the City pay for "the entire cost of health insurance coverage" (Administrative Code § 12-126 [b] [1]) prohibits the City from passing any portion of the cost up to the statutory cap on to its employees and retirees. Section 12-126 does not require the City to fund health insurance without the benefit of federal subsidies.
IV.
Finally, petitioners also contend that the City's actions, insofar as they affected school district employees, violate the Moratorium Law, which, as originally enacted, stated:
"From on and after June 30, 1994 until May 15, 1995, a school district, board of cooperative educational services, vocational education and extension board or a school district as enumerated in section 1 of chapter 566 of the laws of 1967, as amended, shall be prohibited from diminishing the health insurance benefits provided to retirees and their dependents or the contributions such board or district makes for such health insurance coverage below the level of such benefits or contributions made on behalf of such retirees and their dependents by such district or board unless a corresponding diminution of benefits or contributions is effected from the present level during this period by such district or board from the corresponding group of active employees for such retirees" (L 1994, ch 729).
The original text is unaltered except for the sunset date, which the legislature extended several times until eliminating it entirely (see L 2009, ch 504, § 14).
The Moratorium Law sets " 'a bottom floor, beneath which school districts and certain boards [a]re forbidden to go in diminishing' " their retirees' health insurance coverage benefits or the districts' contributions for the cost of such coverage (Kolbe v Tibbetts, 22 NY3d 344, 358 [2013]). The statute does not require that benefits be equal as between retirees and active employees (see Matter of Jones v Board of Educ. of Watertown City School Dist., 30 AD3d 967, 968-970 [4th Dept 2006]). Here, the parties stipulated to the completeness of the record. On that record, petitioners failed to introduce sufficient evidence to establish that the City's decision to shift retirees to the Aetna MAP constitutes a diminution in retiree benefits or the City's contributions for those benefits. We therefore conclude that the cause of action based on the Moratorium Law fails as well.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to Supreme Court for further proceedings in accordance with this opinion.
Order reversed, with costs, and matter remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein. Opinion by Judge Troutman.
Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Halligan concur.
Decided June 18, 2025

Footnotes

Footnote 1: Petitioners also sought class certification (CPLR art 9) and, although there was never a motion to certify a class, the injunction encompasses all retirees, not only petitioners (see 229 AD3d 95, 103 [1st Dept 2024]). Respondents argue, in light of a stipulation between the parties, that petitioners waived class certification, and petitioners argue based on the same stipulation that respondents waived any opposition to it. We need not decide this issue because we conclude that petitioners failed to establish their entitlement to judgment.

Footnote 2: We do not mean to suggest that statements in a letter from the mayor could create a permanently binding promise, nor that statements in such a letter could negate an otherwise clear and unambiguous promise.